[No. B182588. Second Dist., Div. One. Sept. 29, 2006.]

KENNY GRAVILLIS, JR., et al., Plaintiffs and Respondents, v.
COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY et al.,
Defendants and Appellants.

762

**COUNSEL**

Robert J. Shulkin; Gemmill Thornton & Baldridge, Bruce M. Thornton and Carlos V. Yguico for Defendants and Appellants.

June Babiracki Barlow and Neil D. Kalin for California Association of Realtors as Amicus Curiae on behalf of Defendants and Appellants.

James S. Link; Law Offices of Robin L. Haulman, Robin L. Haulman; Law Offices of Diane Corwin and Diane Corwin for Plaintiffs and Respondents.

## OPINION

**MALLANO, Acting P. J.**—Plaintiffs, a married couple, bought a home using the standard form California purchase agreement, which required the arbitration of disputes arising out of the agreement or any resulting transaction. The agreement excluded from arbitration "an action for bodily injury." Before plaintiffs moved into the home, they learned that extensive structural damage had rendered it uninhabitable.

Plaintiffs filed this action against their brokers for failing to disclose the structural damage. The complaint alleged that, as a result of the nondisclosure, plaintiffs experienced emotional distress. In addition, the wife contended that the emotional distress caused her to develop a form of diabetes. The brokers moved to compel arbitration. The trial court denied the motion on the ground that the action was one for bodily injury.

We conclude that an action for bodily injury, within the meaning of an arbitration exclusion in a residential purchase agreement, does not encompass the claims alleged here. Emotional distress and diabetes caused by emotional distress are not the types of bodily injury that the contracting parties would reasonably expect to fall within the scope of the exclusion. We therefore reverse.

## I

## BACKGROUND

The following allegations and facts are taken from the complaint and the evidence submitted on the motion to compel arbitration.

### A. *The Complaint*

Plaintiffs Kenny Gravillis, Jr., and Deanna Gravillis entered into a "Residential Purchase Agreement" (Agreement) to buy a home in Los Angeles, California. Their brokers were defendants Coldwell Banker Residential Brokerage Company (Coldwell Banker Brokerage) and two of its employees (collectively Brokers). Deanna, Kenny's wife, "participated in the negotiations, home inspection and the purchase of the subject property as a real party to the transaction."

The Brokers failed to disclose "known material facts and defects" about the residence, including (1) termite infestation that rendered the home uninhabitable, (2) earthquake damage that made the home structurally unsound, (3) water intrusion damage, and (4) cosmetic repairs that concealed the structural damage. The Brokers failed to discuss the results of a termite inspection report that would have disclosed, or put the Gravillises on notice of, the damage. And the Brokers were negligent in recommending the company that conducted the termite inspection. If the Brokers had made the proper disclosures, the Gravillises would not have purchased the home.

At the time of the negotiations and the purchase of the home, Deanna was pregnant. When the damage to the home was discovered, Deanna was advised that, while on the property, she should wear a mask and special clothing to protect herself and her unborn child from exposure to dry rot, fungus, and other hazardous substances. This advice made the Gravillises suffer severe emotional distress, worry, depression, anxiety, and fear.

The complaint alleged four causes of action against the Brokers: breach of fiduciary duty, negligence, breach of the duty to be honest and truthful, and violation of the California unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). The first three claims were premised on the Brokers' alleged failure to disclose material facts about the condition of the property. The UCL claim alleged that the Brokers engaged in a practice of choosing home inspectors and pest control companies that would minimize the disclosure of property defects in exchange for future business.[1] As a proximate result of the various nondisclosures, the Gravillises suffered severe emotional distress, pain and suffering, property damage, damage to credit, moving expenses, the cost of alternative living arrangements, lost wages, repair costs, investigative costs, and attorney fees. The complaint prayed for damages according to proof.

The Gravillises also sued the seller of the property, the seller's brokers, the company that inspected the property, and the individual who owned that company. The complaint alleged that these defendants also failed to disclose the structural damage to the home. The Brokers are the only parties to this appeal.

## B. *Motion to Compel Arbitration*

Relying on the arbitration provision in the Agreement, the Brokers filed a motion to compel arbitration of the claims against them and to stay the action

---

[1] The UCL is equitable in nature and permits only limited forms of relief such as injunctions and restitution; compensatory damages are not available. (See *Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1009 [36 Cal.Rptr.3d 592].)

pending the outcome of arbitration. The Agreement, a preprinted form prepared by amicus curiae California Association of Realtors, is, according to the association, the most frequently used form in California for the sale of residential real estate. In 2003, for example, the association sold over 750,000 forms.

The Agreement indicated that the Gravillises were buying the property for $500,000, of which $485,000 would be financed through a 30-year mortgage with a fixed rate of 8.5 percent. Under the Agreement, the seller was obligated to pay for a pest control report to be prepared by a registered structural pest control company of the seller's choosing. The seller was also required to "disclose known material facts and defects" in the property. The property would be sold "in its PRESENT physical condition . . . subject to Buyer Inspection rights." The buyer had "the right to inspect the Property and, based upon the information discovered in those Inspections, [to] reasonably request that Seller make Repairs, corrections or take other action." The Agreement permitted the buyer to "inspect for wood destroying pests and organisms." It also stated, "Note to Buyer: You are strongly advised to conduct Inspections of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important." The Agreement set forth in detail the seller's rights and obligations in making repairs and the deadlines for requesting and agreeing that repairs would be made.

The Agreement named Coldwell Banker Brokerage and its two employees as the brokers for the Gravillises and listed Prudential California Realty as the broker for the seller. It also stated, "If Brokers give Buyer or Seller referrals to persons, vendors, or service or product providers . . . , Brokers do not guarantee the performance of any of those Providers."

The Agreement contained an arbitration provision that stated in part: "ARBITRATION OF DISPUTES: . . . Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction . . . shall be decided by neutral, binding arbitration . . . [subject to the exclusions noted below]. The arbitrator . . . shall render an award in accordance with substantive California Law. In all other respects, the arbitration shall be conducted in accordance with Part III, Title 9 of the California Code of Civil Procedure. . . . [¶] . . . [¶] . . . Buyer and Seller agree to . . . arbitrate disputes or claims involving either or both Brokers." However, "[a]ny election by either or both Brokers to participate in . . . arbitration shall not result in Brokers being deemed parties to the Agreement."

The Agreement excluded from arbitration "an action for bodily injury or wrongful death." It also excluded "any right of action to which Code of Civil Procedure § 337.1 or § 337.15 applies," namely, actions involving construction defects.

The arbitration provision further provided: "NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION." Kenny initialed the space for the buyer. The seller also initialed the appropriate space.

In moving to compel arbitration, the Brokers argued that the Agreement was "a contract evidencing a transaction involving commerce" (9 U.S.C. § 2), and arbitration was therefore required under the Federal Arbitration Act (FAA) (9 U.S.C. §§ 1–16). The Brokers requested a stay of the action pending the outcome of arbitration.

In their opposition papers, the Gravillises argued, first, the arbitration exclusion applied because they sought damages for bodily injury.[2] Second, the FAA was not applicable because the Agreement did not involve interstate commerce; instead, the California Arbitration Act (CAA) (Code Civ. Proc., §§ 1280–1294.2) applied. Finally, under the CAA, arbitration should be

---

[2] The Gravillises also argued that arbitration was improper based on the separate exclusion for construction defects. In response, the Brokers asserted that the construction defect exclusion applied only to suits against architects, contractors, and other persons involved in the planning or construction of improvements to real property. On appeal, the Gravillises have abandoned this ground for denying arbitration. Accordingly, we will not consider the merits of the construction defect exclusion.

denied because two of the defendants (the inspection company and its owner) were not parties to the Agreement and thus not subject to arbitration. (See Code Civ. Proc., § 1281.2, subd. (c); all further section references are to the Code of Civil Procedure unless otherwise indicated.)

At a hearing on September 28, 2004, the trial court stated that it was denying the motion to compel arbitration based on the exclusion for bodily injury. The Brokers requested a statement of decision. (See § 1291.) Counsel for the Gravillises agreed to draft one. By minute order filed the day of the hearing, the trial court denied the motion.

The Gravillises lodged a proposed order and statement of decision. The Brokers filed objections, which repeated in part their substantive arguments as to why the motion to compel should have been granted. The Gravillises filed a one-page reply accusing the Brokers of "trying to get a 'second bite at the apple.'"

On January 18, 2005, the trial court issued an order stating, "Upon reading the material submitted by [the Brokers], the Court orders this matter to arbitration." The court vacated the dates for the final status conference and the trial.

In response, the Gravillises filed a motion for reconsideration based on "new circumstances." (See § 1008, subd. (a).) The Brokers filed opposition papers. The motion was argued on March 3, 2005. The trial court announced at the hearing that it was granting reconsideration and denying the motion to compel arbitration.

On March 7, 2005, the trial court issued an order and statement of decision, explaining: "This case should be tried rather than arbitrated. Actions for bodily injury . . . , which we have here, are excluded from arbitration." The Brokers appealed.

## II

## DISCUSSION

■ "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." (§ 1281.2.) In a petition to compel arbitration, "the moving party, in essence, requests specific performance of a contractual agreement to arbitrate the controversy. . . . The trial

court must determine in advance whether there is a duty to arbitrate the controversy. . . . This determination 'necessarily requires the court to examine and, to a limited extent, construe the underlying agreement.' " (*Green v. Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 69 [254 Cal.Rptr. 689], citations omitted.)

■ The interpretation of an arbitration provision "is solely a judicial function unless it turns upon the credibility of extrinsic evidence; accordingly, an appellate court is not bound by a trial court's construction of a contract based solely upon the terms of the instrument without the aid of evidence." (*Merrick v. Writers Guild of America, West, Inc.* (1982) 130 Cal.App.3d 212, 217 [181 Cal.Rptr. 530]; accord, *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515].) Where, as here, the language of an arbitration provision is not in dispute, the trial court's decision as to arbitrability is subject to de novo review. (See *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809].)

■ " 'The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made.' . . . Because California has a ' "strong public policy in favor of arbitration" ' . . . , '. . . arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question' . . . . 'Doubts as to whether an arbitration [provision] applies to a particular dispute are to be resolved in favor of sending the parties to arbitration.' . . ." (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188], citations omitted; accord, *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24–25 [74 L.Ed.2d 765, 103 S.Ct. 927].)

■ "Arbitration is . . . a matter of contract, and the parties may freely delineate the area of its application. The court's role . . . must be strictly limited to a determination of whether the party resisting arbitration agreed to arbitrate. A heavy presumption weighs the scales in favor of arbitrability; an order directing arbitration should be granted 'unless it may be said with positive assurance that the arbitration [provision] is not susceptible of an interpretation that covers the asserted dispute.' " (*O'Malley v. Wilshire Oil Co.* (1963) 59 Cal.2d 482, 490–491 [30 Cal.Rptr. 452, 381 P.2d 188]; accord, *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 650–652 [89 L.Ed.2d 648, 106 S.Ct. 1415].) To the extent possible, an exclusionary clause in an arbitration provision should be narrowly construed. (See *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 814 [9 Cal.Rptr.2d 702]; *Nilsen v. Prudential-Bache Securities* (S.D.N.Y. 1991) 761 F.Supp. 279, 286; see also *Circuit City Stores,*

*Inc. v. Adams* (2001) 532 U.S. 105, 118 [149 L.Ed.2d 234, 121 S.Ct. 1302] [statutory exclusion in FAA for certain types of employment contracts should be narrowly interpreted].)

■ "The burden is on the party opposing arbitration to show the agreement cannot be interpreted to apply to the dispute. . . . Whether a contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself. . . . The policy in favor of arbitration does not apply when the contract cannot be interpreted in favor of arbitration. There is no policy in favor of arbitrating a dispute the parties did not agree to arbitrate." (*Balandran v. Labor Ready, Inc.* (2004) 124 Cal.App.4th 1522, 1527–1528 [22 Cal.Rptr.3d 441], citations omitted.)[3]

■ As a preliminary matter, the Brokers contend that the Gravillises' motion for reconsideration was improper. In general, a prior order may be reconsidered upon a showing of "new or different facts, circumstances, or law." (§ 1008, subd. (a).) As stated, the trial court initially *denied* the Brokers' motion to compel, announcing its ruling at the hearing and filing a minute order to that effect. But after reviewing the Gravillises' proposed statement of decision and the Brokers' objections thereto, the trial court, without notice or a hearing, issued an order *granting* the motion to compel, relying on the objections. The trial court later granted the Gravillises' reconsideration motion, issuing a third order again *denying* arbitration.

The Brokers argue, ironically, that the trial court could reverse the first order in response to their objections but could not reinstate the original ruling based on a motion for reconsideration. Assuming, without deciding, that the statutory requirements for reconsideration apply when a trial court reverses an order in this manner (see § 1008, subd. (a)), we conclude that new circumstances justified the Gravillises' motion for reconsideration.

In essence, the trial court treated the Brokers' objections to the proposed statement of decision as a de facto motion for reconsideration and reversed the first order. This abrupt reversal, without notice or a hearing, constituted new circumstances justifying reconsideration under section 1008. (See *Johnston v. Corrigan* (2005) 127 Cal.App.4th 553, 556 [25 Cal.Rptr.3d 657] [reconsideration proper based on new circumstances where trial court initially denied special motion to strike without considering memorandum of points and authorities in support of motion]; *Kollander Construction, Inc. v. Superior*

---

[3] Although Deanna is not a signatory to the Agreement, she does not dispute that she is bound by the arbitration provision. Nor do the Gravillises dispute that the Brokers, also nonsignatories, may enforce that provision. (See generally Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2005) ¶¶ 5:261 to 5:276.2, pp. 5-147 to 5-157 [discussing enforcement of arbitration provisions by and against nonsignatories].)

*Court* (2002) 98 Cal.App.4th 304, 314 [119 Cal.Rptr.2d 614] [new circumstances justified reconsideration so that party moving to set aside dismissal could have "full and fair hearing" to respond to opposing party's posthearing filing of supplemental points and authorities], overruled on another point in *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107, fn. 5 [29 Cal.Rptr.3d 249, 112 P.3d 636].) The trial court could therefore reinstate its original ruling pursuant to the Gravillises' motion to reconsider.

## A. *Arbitration Exclusion for Bodily Injury*

The form agreement used in this case has been the subject of prior judicial interpretation. (See, e.g., *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1515–1520 [22 Cal.Rptr.3d 429]; *id.* at pp. 1518–1520 [citing cases]; *Johnson v. Siegel* (2000) 84 Cal.App.4th 1087, 1093–1095 [101 Cal.Rptr.2d 412]; *id.* at pp. 1101–1102 [citing cases].) But no court has construed the arbitration provision's bodily injury exclusion. As we now discuss, the injuries alleged by the Gravillises do not come within the exclusion.

In opposing the motion to compel arbitration, Deanna submitted evidence of her injuries as follows: "I attribute physical, mental, and emotional injuries to this incident. When we purchased our 'dream home' we were very excited to remodel our home and move in prior to the date of the birth of my second child. We retained a contractor to perform cosmetic remodeling with an estimate of approximately $100,000. My husband, my young daughter and I went on a Disney cruise hoping to return to our home in a near finished state. Instead, we returned home to find a pile of lumber. Because I was pregnant my contractor was afraid to inform me on our trip on the status of our remodel and when we returned from our Disney cruise there was a fax, which stated that we should call our contractor and come to the site immediately. My husband and I drove to the site and observed our home taken down to the frame. I stood on the sidewalk in front of our home and could see Kenny standing in the backyard. This certainly was not anticipated by our cosmetic remodel and we soon discovered that the home had been complete[ly] obliterated by termite damage which had been cosmetically concealed.

"This incident caused me extreme and severe mental and emotional stress and devastation, which manifested itself physically. I developed gestational diabetes, which I had never suffered from in my prior pregnancy. I was in perfect health prior to this horrendous experience and I continued to suffer from emotional, psychological and physical symptoms as a result of the ongoing stress created by the purchase of this pile of wood which left us with a huge mortgage we had to pay on this new home and required us to enter into several other additional loans in order to fund the rebuilding of this

home. We were also evicted from our prior residence as the owner had made plans for our prior residence when we gave notice intending to move into our 'dream home.' . . .

"The purchase of this termite-ridden residence and all of the damages that flowed therefrom completely ruined the experience of the birth of my second child. I was under incredible stress and required additional treatment. . . . What should have been the happiest time of our lives was destroyed and devastated. Prior to this event our credit was excellent. After the purchase of this 'home' our credit has been ruined, we are deeply in debt, our business has suffered, my husband and myself have suffered grave emotional, physical and mental stress."

Kenny offered this evidence: "[I experienced] [e]xtremely high stress dealing with the discovery that [our] 'dream home' was no more than a pile of rubble that required a complete rebuild which we could not afford; we had already given notice at our prior residence and were being evicted by our landlord when we could not move out due to the fact that we could not move into our new home. We were paying rent at our old residence in addition to the mortgage on this new 'home.' I was extremely nervous, emotional and stressed about my wife's pregnancy [and] her developing gestational diabetes which she had never suffered from before. I was in terrible stress and I continued to be in terrible stress due to the financial fallout from this horrendous experience. . . . We then had to take out additional loans in an amount in excess of $500,000 to rebuild the house."

The Gravillises do not contend they suffered emotional distress as a result of living in the home. The structural (termite) damage was discovered by the remodeling contractor while the Gravillises were out of town. After returning from their trip, the Gravillises were told about the termite infestation and saw what remained of the structure. The only injury they sustained from being on the property was the distress caused by the advice that Deanna wear a mask and protective clothing to protect herself and her unborn child from dry rot, fungus, and other hazardous substances. The Gravillises do not allege they were actually exposed to any harmful matter. Deanna contends that, as a consequence of the emotional distress, she developed gestational diabetes.

### 1. *Emotional Distress*

■ Although courts have not construed "bodily injury" as used in the Agreement's arbitration exclusion, that term has been interpreted in insurance policies. The rules of construction generally applicable to contracts govern the interpretation of both arbitration provisions and insurance policies, that is, we interpret the words in their ordinary sense, according to the plain meaning

a layperson would attach to them. (See *Hotels Nevada, LLC v. Bridge Banc, LLC* (2005) 130 Cal.App.4th 1431, 1435 [30 Cal.Rptr.3d 903]; *Blasiar, Inc. v. Fireman's Fund Ins. Co.* (1999) 76 Cal.App.4th 748, 753–754 [90 Cal.Rptr.2d 374].) " 'The purpose of the law of contracts is to protect the reasonable expectations of the parties.' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268 [35 Cal.Rptr.3d 343]; accord, *County of Solano v. Lionsgate Corp.* (2005) 126 Cal.App.4th 741, 747 [24 Cal.Rptr.3d 362] [arbitration provision]; *Fittante v. Palm Springs Motors, Inc.* (2003) 105 Cal.App.4th 708, 722 [129 Cal.Rptr.2d 659] [same]; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 756–757 [27 Cal.Rptr.3d 648, 110 P.3d 903] [insurance policy]; *California Auto. Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1299 [5 Cal.Rptr.3d 761] [same].) In construing arbitration provisions, courts may also consider the subject matter of the agreement and the industry involved. (See *Spinello v. Amblin Entertainment* (1994) 29 Cal.App.4th 1390, 1398–1399 [34 Cal.Rptr.2d 695].)

■ "The bodily injury clause in [a comprehensive general liability insurance] policy has been interpreted on numerous occasions. The cases overwhelmingly hold that the phrase 'bodily injury, sickness or disease' is plain and unambiguous and that coverage under the bodily injury clause is limited to physical injury to the body and does not include nonphysical, emotional or mental harm.

■ "In giving meaning to the term 'bodily' as laypersons commonly understand it, the case law draws on both the dictionary definition[s] of the word and the general principles of law relating to the interpretation of insurance contracts. 'Bodily' under dictionary definition[s] is equated with 'physical, corporeal' as opposed to 'mental or spiritual.' For example, Webster defines 'bodily' as 'having a body or a material form: physical, corporeal . . . . [¶] . . . Bodily contrasts with *mental* or *spiritual*.' (Webster's New Internat. Dict. (3d ed. 1981) p. 245, italics in original; see also Webster's New Collegiate Dict. (9th ed. 1984) p. 164.) The American Heritage Dictionary (2d College ed. 1982) describes 'bodily' as '*adj.* 1. Of, pertaining to, within, or exhibited by the body; *bodily organs.* 2. Physical as opposed to mental or spiritual; *bodily welfare adv.* 1. In the flesh; in person; *bodily but not mentally present.*' (At p. 193, italics in original.) The Random House Dictionary of the English Language (2d ed. 1987) defines 'bodily' as '1. of, or pertaining to, the body; 2. corporeal or material as contrasted with spiritual or mental.' (At p. 232.) Similarly, Black's Law Dictionary (6th ed. 1990) defines 'bodily' as 'Pertaining to or concerning the body; of or belonging to the body or the physical constitution; not mental but corporeal.' (At p. 175.) In brief, under definitional unanimity, the ordinary and popular meaning of the word 'bodily' does not reasonably encompass the purely mental, emotional and spiritual.

"Federal, sister-state and California cases are in accord with the dictionary definition[s] of 'bodily' as the term is used in insurance policies. . . . [T]he term 'bodily injury' in an insurance policy limits the harm covered to physical injury, sickness, or disease and does not include nonphysical, emotional harm to the person." (*Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 854 [13 Cal.Rptr.2d 318], discussed with approval in *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 21–23, 27–28 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

Case law outside the insurance context is to the same effect. In *Eastern Airlines, Inc. v. Floyd* (1991) 499 U.S. 530 [113 L.Ed.2d 569, 111 S.Ct. 1489] (*Eastern Airlines*), passengers who had been on a flight to the Bahamas sought damages for mental distress sustained when they were informed during the flight that, due to engine failure, the plane was going to crash in the Atlantic Ocean. As it turned out, the plane landed safely at Miami International Airport. The Warsaw Convention limited the airline's liability to the "death or wounding of a passenger or any other bodily injury suffered by a passenger." (Convention for the Unification of Certain Rules Relating to International Transportation by Air (Warsaw Convention), Oct. 12, 1929, art. 17, 49 Stat. 3000, 3014, 3018, T.S. No. 876; see *Eastern Airlines, supra,* at pp. 535, 537.) Stating that its task was to " 'give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties' " (*Eastern Airlines, supra,* at p. 540), the court held—after reviewing dictionary definitions, the treaty's negotiating history, and case law—that "bodily injury" does not include purely mental or psychic injuries or emotional distress (*id.* at pp. 542, 544–545, 552).

In reaching that conclusion, the court commented: "[T]he unavailability of compensation for purely psychic injury in many common and civil law countries at the time of the Warsaw Conference persuades us that the signatories had no specific intent to include such a remedy in the Convention." (*Eastern Airlines, supra,* 499 U.S. at pp. 544–545, fn. omitted.) Put another way, if recovery for a particular type of injury is not legally cognizable, the parties are not likely to have contemplated it as a "bodily injury" deserving of protection in a contract.

A similar analysis about the unavailability of damages for emotional distress applies here. Under California law, it is doubtful the Gravillises can recover for emotional distress given that (1) their claims are based on a broker's alleged failure to disclose property (termite) damage, and (2) the emotional distress was caused solely by what they saw and heard after the property had been damaged. (See *Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1161–1162 [8 Cal.Rptr.2d 263] [emotional distress not compensable for fraud in purchase of property]; *Friedman v. Merck & Co.*

(2003) 107 Cal.App.4th 454, 475–487 [131 Cal.Rptr.2d 885] [negligent misrepresentation may permit recovery of *pecuniary* losses]; *Allstate Ins. Co. v. Miller* (N.D.Cal. 1990) 743 F.Supp. 723, 726–728 [no emotional distress damages for failure to disclose property defects]; Civ. Code, § 3343 [limiting types of damages recoverable in fraud actions involving purchase of property]; 12 Miller & Starr, Cal. Real Estate (3d ed. 2001) §§ 34:91, 34:129–34:136, pp. 328–329, 425–437 [discussing types of damages available in real estate litigation]; 1 Cal. Civil Practice Real Property Litigation (2005) §§ 1:43, 2:23–2:29, pp. 1-70 to 1-71, 2-43 to 2-60 [discussing actions against, and damages recoverable from, brokers]; 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 1022–1037, pp. 296–332 [recovery for emotional distress may depend on whether physical trauma is present]; see also *Ketchmark v. Northern Ind. Public Service* (Ind.Ct.App. 2004) 818 N.E.2d 522, 524–525 [plaintiffs could not recover for emotional distress where gas explosion destroyed their home while they were away].)

" 'The fact that emotional distress damages may be awarded in some circumstances . . . does not mean they are available in every case in which there is an independent cause of action founded upon negligence.' . . . 'No California case has allowed recovery for emotional distress arising solely out of property damage' . . . ; moreover, a preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 554–555 [87 Cal.Rptr.2d 886, 981 P.2d 978] (*Erlich*), citations omitted.)

"[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. *Even then*, with rare exceptions, a breach of the duty *must threaten physical injury*, *not simply damage to property or financial interests*." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985 [25 Cal.Rptr.2d 550, 863 P.2d 795], italics added; accord, *Erlich*, *supra*, 21 Cal.4th at pp. 554–557.)

Real estate brokers have a legal duty to make certain disclosures to their principals. (See 1 Cal. Civil Practice. Real Property Litigation, *supra*, §§ 2:23–2:24, pp. 2-43 to 2-50.) But we cannot say that the mere nondisclosure of termite damage, absent exposure to a real or tangible effect of the infestation (for example, the collapse of a wall), threatens a buyer with physical injury. Rather, a breach of duty, as alleged in this case, directly affects only a property or financial interest. Thus, the Gravillises could not

have reasonably expected that a claim for emotional distress would exist against a broker in the circumstances here, much less that the claim would be one for bodily injury.

Further, some degree of emotional distress often attends home purchases. As our Supreme Court observed in holding that emotional distress damages are not recoverable for negligent construction of a house: "The [plaintiffs] may have hoped to build their dream home and *live happily ever after*, but there is a reason that tag line belongs only in fairy tales. Building a house may turn out to be a stress-free project; it is much more likely to be the stuff of urban legends—the cause of bankruptcy, marital dissolution, hypertension and fleeting fantasies ranging from homicide to suicide. . . . 'No reasonable homeowner can embark on a building project with certainty that the project will be completed to perfection. Indeed, errors are so likely to occur that few if any homeowners would be justified in resting their peace of mind on [its] timely or correct completion . . . .' " (*Erlich, supra,* 21 Cal.4th at pp. 557–558, italics added.)

Thus, if emotional distress were considered a bodily injury, the arbitration exclusion in the Agreement could apply in virtually every dispute, rendering the arbitration provision a nullity. Few, if any, claims would ever be subject to arbitration. Because the exclusion should not "swallow[] the binding arbitration rule" (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 676 [42 Cal.Rptr.3d 868, 133 P.3d 1028]), we decline to construe "bodily injury" to include purely emotional distress.

Our conclusion is supported by legislative intent in this area. The bodily injury exclusion in the Agreement is mandated by section 1298.7, which provides that "[i]n the event an arbitration provision is included in a contract or agreement [to convey real property], it shall not preclude or limit any right of action for bodily injury . . . ." Enacted in 1988, section 1298.7 was not part of the original bill (Assem. Bill No. 1240 (1987–1988 Reg. Sess.) § 1, as introduced Mar. 3, 1987) (Assembly Bill No. 1240). As first drafted, the bill added only sections 1298 and 1298.5 to the code. Section 1298, subdivision (c), requires a "NOTICE" clause like the one the contracting parties initialed in this case. (See pt. I.B., *ante.*) Section 1298.5 addresses the filing of a lis pendens.

While the legislation was pending, the California Trial Lawyers Association (CTLA) informed the bill's sponsor by letter that it was opposed to the law, stating: "This bill would require standardized language for agreements to arbitrate (1) disputes arising from contracts to convey real property, and (2) disputes between real estate agents and the buyer or seller who hires the agent. [¶] . . . [¶] . . . Most consumers would probably not realize that they

might be giving up their rights to discovery and a jury trial if they suffer injuries from patent or latent defects in the house." (CTLA, letter to Assemblyman Byron Sher, July 18, 1988.)

As noted in a later Senate committee analysis, "Although intended as [an] expedited process to resolve contract disputes arising out of a real property transaction, this bill could be interpreted to also apply to require the arbitration of personal injury or property damage claims arising out of a real property transaction. For example, the signing of such a provision could be argued to bar a lawsuit by a purchaser of a home for recovery of damages for personal injury, property damage, or wrongful death caused by the negligence or defective product of the seller/builder. [¶] . . . [¶]

"[As] CTLA contends, it is not at all probable that a prospective purchaser of a home who encounters an arbitration provision in a standardized real estate sales agreement would clearly know that he would, upon signing the arbitration provision, be waiving his right to judicial resolution of any claim for personal injuries caused by the defective construction of the home. More likely, the buyer would expect it to cover matters specifically covered in the contract such as the date of closing, which improvements are included with the house, and matters of that sort.

". . . Moreover, the notice provided by the bill would not clearly warn a party that he would be waiving his rights to judicial resolution of a personal injury or property damage claim, as opposed to agreeing to arbitrate a dispute involving the purchase of the home." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1240, *supra*, as amended Aug. 1, 1988, pp. 4–5, underscoring omitted.)

The bill was accordingly amended in the Senate to add section 1298.7, requiring the bodily injury exclusion. (See Assem. Bill No. 1240, *supra*, as amended Aug. 10, 1988.) The Assembly concurred in the amendment, and the Governor approved the bill. (See Stats. 1988, ch. 881, § 1, pp. 2820–2821; 1 Assem. Final History on Assem. Bill No. 1240, *supra*, p. 873.)

The Gravillises' claims reflect matters specifically covered in the Agreement, namely, the pest control inspection, the discovery of termite damage, and the disclosure of the damage. The evidence filed in opposition to the motion to compel arbitration focused on termite infestation, not defects in the construction of the home. The Agreement expressly covered damage caused by "pests"—the precise type of damage that the Gravillises fault the Brokers for not disclosing. The complaint also seeks to hold the Brokers liable for the failings of the company that inspected the property. But under the Agreement, the seller selected the pest control company, and the Brokers did not guarantee the performance of any service provider they recommended.

Nor do we think the Legislature intended "bodily injury" to include a type of harm for which compensation would not be legally proper. (See *Eastern Airlines, supra,* 499 U.S. at pp. 544–545 ["bodily injury," as used in Warsaw Convention, does not include purely emotional distress, in part because such recovery is rarely available].) As we have discussed, it is unlikely that the Gravillises can recover emotional distress damages on the facts of this case. (See *ante,* at pp. 776–778.)

In short, the gist of the action is a dispute involving the purchase of a home—in particular, the disclosure of termite damage—which is subject to arbitration; it is not a claim for personal injuries caused by, for example, defective construction, which comes within the arbitration exclusion.

We acknowledge that section 1298.7—which mandates the bodily injury exclusion—*may be* preempted by the FAA in cases where the parties' contract evidences a transaction involving interstate commerce. (See 9 U.S.C. § 2; *Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 582–587 [11 Cal.Rptr.3d 787] [FAA preempts § 1298]; see also *Perry v. Thomas* (1987) 482 U.S. 483 [96 L.Ed.2d 426, 107 S.Ct. 2520] [FAA preempts Lab. Code, § 229, which exempts wage collection disputes from arbitration].) Thus, under the FAA, the *failure* to include the exclusion in a purchase agreement might permit the arbitration provision to be enforced in an action for bodily injury. (See *Hedges v. Carrigan, supra,* 117 Cal.App.4th at pp. 582–585.) Here, however, the Agreement *does* contain the exclusion. Consequently, regardless of whether the FAA applies, we are called upon to interpret the exclusion in determining the contracting parties' intent, and section 1298.7's legislative history aids us in that task. (See *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 91–93 [80 Cal.Rptr.2d 147]; *Holbrook v. Pitt* (7th Cir. 1981) 643 F.2d 1261, 1271 & fn. 18; *Chaplin v. Consolidated Edison Co.* (S.D.N.Y. 1984) 579 F.Supp. 1470, 1473.)

In sum, based on the plain language of the Agreement and the legislative history of section 1298.7, we hold that the arbitration exclusion for bodily injury does not include the Gravillises' claims for emotional distress.

### 2. *Gestational Diabetes*

Unlike emotional distress, gestational diabetes is a physical condition. Diabetes is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin." (Dorland's Illustrated Medical Dict. (28th ed. 1994) p. 457.) Gestational diabetes is "carbohydrate intolerance with onset or first recognition during pregnancy; this category does not include diabetics who become pregnant." (*Id.* at p. 456.)

According to the United States Department of Health and Human Services, National Institutes of Health, the risk factors for gestational diabetes include the mother's ethnicity, weight, age, and history of prior pregnancy. (See U.S. Dept. Health & Human Services, Nat. Insts. of Health, *Am I At Risk For Gestational Diabetes?* (June 2005) <http://www.nichd.nih.gov/publications/pubs/upload/gest_diabetes_risk_2005.pdf> [as of Sept. 29, 2006]; MedlinePlus Medical Encyclopedia, Gestational Diabetes (Aug. 8, 2005) <http://www.nlm.nih.gov/medlineplus/ency/article/000896.htm> [as of Sept. 29, 2006].) It does not follow, however, that gestational diabetes is a bodily injury for purposes of the Agreement's arbitration exclusion.

As discussed, section 1298.7 distinguishes between disputes involving the purchase of a home—matters specifically covered in the purchase agreement—which are arbitrable, and claims for personal injuries caused by negligence or a defect in the home, which are not. The Gravillises' claims are based on the nondisclosure of termite damage—an omission that occurred during the purchase process and which is expressly covered by the Agreement.

Further, Deanna does not contend that the termite damage caused her diabetes. Instead, she asserts that (1) the Brokers failed to disclose the termite damage, (2) she experienced emotional distress as a result of seeing and hearing about the damage after it occurred, and (3) the resulting emotional distress caused diabetes. In *Erlich, supra,* 21 Cal.4th 543, the Supreme Court rejected a similar recovery in an action for negligent construction of a house, explaining: "Here, the breach—the negligent construction of the [plaintiffs'] house—did not cause physical injury. No one was hit by a falling beam. Although the [plaintiffs] state they feared the house was structurally unsafe and might collapse in an earthquake, they lived in it for five years. The only physical injury alleged is [the husband's] heart disease, which flowed from the emotional distress and *not directly* from the negligent construction." (*Id.* at p. 557, italics added.)

*Erlich* cited approvingly *McMeakin v. Roofing & Sheet Metal Supply* (1990) 1990 OKCIVAPP 101 [807 P.2d 288]. (See *Erlich, supra,* 21 Cal.4th at p. 559.) In *McMeakin,* the plaintiffs retained a roofing contractor to work on their home. The roofer stacked six tons of brick tiles on the roof. The roof collapsed, pushed the walls of the house outward, and completely destroyed the structure. The plaintiffs, though not inside the house, were on the property and witnessed the damage when it occurred. They brought an action against the roofing company for negligence and breach of contract, alleging emotional distress and physical injuries. The roofer moved for summary judgment. The plaintiffs filed evidence in opposition, including an affidavit from a

physician stating that the husband had suffered a heart attack and required quadruple bypass surgery as a result of the emotional distress caused by the collapse.

The trial court granted summary judgment for the roofer, and the Oklahoma Court of Appeals affirmed, stating: "[The husband] was not injured physically at the time his home was destroyed . . . . Understandably, such an event could cause emotional distress. The key to [his] recovery in this case, however, is whether his subsequent heart attack, one month after the event, was 'connected' to this emotional distress, and, whether the heart attack was a foreseeable result. Despite the physician's affidavit, the trial court properly ruled in favor of [the roofer]. . . . Foreseeability is absent." (*McMeakin v. Roofing & Sheet Metal Supply, supra,* 807 P.2d at pp. 290–291.)

We conclude that the parties to a home purchase agreement would not reasonably expect that, as used in the agreement, "bodily injury" would include diabetes caused by emotional distress which, in turn, is caused by learning about termite damage. More likely, the parties would expect "bodily injury" to mean physical conditions—a bruise, cut, fracture, or concussion—caused directly by a falling beam, a collapsing wall, a cracked floor, or a broken fixture. They might also expect the term to include illnesses and diseases caused by exposure to chemicals, contaminants, dangerous organisms, or other hazardous or infectious matter. (Cf. *Coldwell Banker Residential Brokerage Co. v. Superior Court* (2004) 117 Cal.App.4th 158, 163–167 [11 Cal.Rptr.3d 564] [minor son of buyer of property who developed asthma did not have claim against seller's broker for failure to disclose microbial contamination because seller's broker owed duty of care to buyer, not her son].)

The plain meaning a layperson would ascribe to "bodily injury" in buying a home would not include diabetes, especially where the alleged injuries were sustained in the unusual manner here. " '[A]rbitration should be ordered unless the agreement clearly does not apply to the dispute in question.' " (*Vianna v. Doctors' Management Co., supra,* 27 Cal.App.4th at p. 1189.) Accordingly, the trial court erred in denying the motion to compel arbitration based on the bodily injury exclusion.

B. *Stay or Denial of Arbitration*

Under the CAA, a trial court may stay or deny arbitration in some circumstances even if a valid agreement to arbitrate the dispute exists. More specifically, section 1281.2 states: "[T]he court shall order the [parties] to

arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . . [¶] (c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. . . . [¶] . . . [¶]

"If the court determines that a party to the arbitration is also a party to litigation in a pending court action or special proceeding with a third party . . . , the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding." (Hereafter § 1281.2(c).)

 Under section 1281.2(c), the trial court has the discretion to, among other things, stay or deny arbitration if one or more parties to the action is not subject to arbitration, and multiple proceedings might result in conflicting rulings involving the same transaction. (See *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1114–1115, 1116 [39 Cal.Rptr.3d 437].)

In arguing the motion to compel arbitration below, the parties addressed the applicability of section 1281.2(c). Of course, the trial court did not rely on the statute, finding instead that the exclusion for bodily injury controlled. That exclusion, as we have explained, does not apply. On remand, section 1281.2(c) will again come into play. We therefore address the parties' arguments about the statute.

The Brokers argue that the FAA, not the CAA, applies to this dispute because the Agreement evidences a transaction involving interstate commerce, namely, the financing of a home purchase. (See 9 U.S.C. § 2; *Hedges v. Carrigan, supra,* 117 Cal.App.4th at pp. 585–587; *Citizens Bank v. Alafabco, Inc.* (2003) 539 U.S. 52, 56–58 [156 L.Ed.2d 46, 123 S.Ct. 2037]; *Groome Resources Ltd., LLC v. Parish of Jefferson* (5th Cir. 2000) 234 F.3d 192, 202–206 & fns. 18, 19.) Under the FAA, so the argument goes, a trial court cannot stay or deny arbitration just because there are parties to the action who are not bound by the arbitration provision. (See *Moses H. Cone Hospital v. Mercury Constr. Corp., supra,* 460 U.S. at pp. 19–20.)

■ But the Brokers misunderstand the nature of section 1281.2(c). It is a *procedural* state rule and thus is not preempted by the FAA if the parties have agreed "to arbitrate in accordance with California law." (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 477 [103 L.Ed.2d 488, 109 S.Ct. 1248]; see *id.* at pp. 470, 474–479; accord, *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 385–390, 393 [25 Cal.Rptr.3d 540, 107 P.3d 217].) Where the parties' agreement contains a choice-of-law clause stating that California law will apply, a trial court may exercise its discretion under section 1281.2(c) even if the underlying transaction involves interstate commerce. (*Volt Info. Sciences v. Leland Stanford Jr. U., supra,* at pp. 470, 474–479; *Cronus Investments, Inc. v. Concierge Services, supra,* 35 Cal.4th at pp. 385–390, 393; *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 717–727 [124 Cal.Rptr.2d 607].)

Here, the contracting parties agreed that California law would govern the arbitration provision. The Agreement states: "By initialing in the space below you are agreeing to have any dispute arising out of the matters included in the 'Arbitration of Disputes' provision decided by neutral arbitration *as provided by California law* . . . . If you refuse to submit to arbitration after agreeing to this provision, *you may be compelled to arbitrate* under the authority of the *California Code of Civil Procedure.*" (Italics added, all capitals omitted.) The CAA, which contains section 1281.2(c), is found in the Code of Civil Procedure.[4]

Because the Agreement provides that a motion to compel arbitration is to be decided under California law, we need not decide if the FAA applies.[5] On remand, the trial court shall decide whether to stay or deny arbitration under section 1281.2(c). Absent such a stay or denial, the motion to compel arbitration shall be granted, and the action shall be stayed pending the outcome of the arbitration proceeding.

---

[4] The language in the Agreement that the "*arbitration* shall be *conducted* in accordance with [the CAA]" (italics added) does not indicate, by itself, that the *arbitration provision* should be governed by California law. (See *Warren-Guthrie v. Health Net* (2000) 84 Cal.App.4th 804, 815–816 [101 Cal.Rptr.2d 260], overruled on another point in *Cronus Investments, Inc. v. Concierge Services, supra,* 35 Cal.4th at p. 393, fn. 8.)

[5] The Agreement's choice-of-law language is mandated by section 1298, subdivision (c). If the FAA applied *and* if the Agreement had *omitted* the choice-of-law language, we might reach a different conclusion. (See *Hedges v. Carrigan, supra,* 117 Cal.App.4th at pp. 582–585.) But the buyer and the seller in this case initialed the arbitration provision, which contained the choice-of-law language, indicating their intent that state law apply. (See *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co., supra,* 68 Cal.App.4th at pp. 91–93.)

## III

## DISPOSITION

The order is reversed. On remand, the trial court shall decide whether to stay or deny arbitration under Code of Civil Procedure section 1281.2, subdivision (c), and, absent a stay or denial under that statute, the motion to compel arbitration shall be granted, and the action shall be stayed pending the outcome of the arbitration proceeding. The parties are to bear their own costs on appeal.

Rothschild, J., concurred. Vogel, J., concurred in the judgment only.

A petition for a rehearing was denied October 20, 2006.