Filed 8/15/17

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION ONE

| | |
|---|---|
| HARSHAD & NASIR CORPORATION et al., | No. B269427 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS155377) |
| v. | |
| GLOBAL SIGN SYSTEMS, INC., | |
| Defendant and Appellant. | |
| ─────────────────────────── | |
| FRIENDLY FRANCHISEES CORPORATION, | (Los Angeles County Super. Ct. No. BS155973) |
| Plaintiff and Appellant, | |
| v. | |
| GLOBAL SIGN SYSTEMS, INC., | |
| Defendant and Respondent. | |
| ─────────────────────────── | |
| GLOBAL SIGN SYSTEMS, INC., | (Los Angeles County Super. Ct. No. BS155974) |
| Plaintiff, Appellant and Respondent, | |
| v. | |
| FRIENDLY FRANCHISEES CORPORATION, | |
| Defendant and Appellant; | |
| HARSHAD & NASIR CORPORATION et al., | |
| Defendants and Respondents. | |

| | |
|---|---|
| GLOBAL SIGN SYSTEMS, INC., Plaintiff and Respondent, v. FRIENDLY FRANCHISEES CORPORATION, Defendant and Appellant. | No. B275942 (Los Angeles County Super. Ct. No. BS155974) |
| HARSHAD & NASIR CORPORATION et al., Plaintiffs and Appellants, v. GLOBAL SIGN SYSTEMS, INC., Defendant and Respondent. | No. B275947 (Los Angeles County Super. Ct. No. BS155377) |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Michelle R. Rosenblatt and Josh M. Frederiks, Judges. Reversed with directions.

Greenberg Traurig, Scott D. Bertzyk, Karin L. Bohmholdt, and Hannah B. Shanks-Parkin for Defendant and Appellant Friendly Franchisees Corporation and Defendants and Respondents Harshad & Nasir Corporation, Senior Classic Leasing, LLC, DFG Restaurants, Inc., and Sun Gir, Inc. (case No. B269427); for Defendant and Appellant Friendly Franchisees Corporation (case No. B275942); for Plaintiffs and Appellants Harshad & Nasir Corporation, Senior Classic Leasing, LLC, DFG Restaurants, Inc., and Sun Gir, Inc. (case No. B275947).

The Business Legal Group, Russell M. Frandsen; The Holmes Law Firm and Reginald A. Holmes for Plaintiff, Appellant and Respondent Global Sign Systems, Inc. (case No. B269427); for Plaintiff and Respondent Global Sign Systems, Inc. (case No. B275942); for Defendant and Respondent Global Sign Systems, Inc. (case No. B275947).

Global Sign Systems, Inc. (Global) sued Friendly Franchisees Corporation (FFC) to recover $114,823.72 allegedly owed on unpaid invoices. A few weeks before trial, the parties agreed to submit the dispute to arbitration. Five years later, the arbitrator, Retired Judge David D. Perez, awarded Global $1,154,793.72 in damages, $702,093.86 in prejudgment interest, and $1,142,596.20 in costs and attorney fees. The arbitrator also added four affiliates of FFC (the Affiliates) as joint and several obligors under the award.[1]

Global petitioned the superior court to confirm the award, and FFC and the Affiliates petitioned to vacate the award. The trial court confirmed the award as to FFC and vacated the award as to the Affiliates.[2] Global then filed a motion in the trial court to recover post-arbitration attorney fees from FFC, and the Affiliates moved to recover attorney fees from Global. The court denied these motions, but ruled that the arbitrator could award such fees.

FFC appealed from the judgment confirming the arbitrator's award, and Global appealed from the part of the judgment vacating the award as to the Affiliates. FFC appealed from the order permitting Global to seek post-arbitration attorney fees from the arbitrator, and the Affiliates appealed from the order denying their motion for attorney fees. We consolidated the appeals for purposes of argument and decision.

We conclude that the trial court prejudicially erred when it failed to apply the correct standards in reviewing the arbitrator's award. On the merits, we hold that substantial evidence does not support the award and that an alleged contract to be performed over a three-year period violated the statute of frauds. Further, the arbitrator exceeded his authority by deciding a claim that

---

[1] The Affiliates are Harshad & Nasir Corporation, Senior Classic Leasing, LLC, DFG Restaurants, Inc., and Sun Gir, Inc.

[2] The orders confirming in part and vacating in part the arbitrator's award were issued by Judge Michelle R. Rosenblatt.

FFC had not agreed to arbitrate. We agree with the trial court, however, that the arbitrator exceeded his authority when he added the Affiliates as obligors under the award. Lastly, we deem the appeals from the orders denying attorney fees as petitions for writ of mandate and direct the trial court to vacate its orders and to deny the motions.

## FACTUAL AND PROCEDURAL SUMMARY[3]

### A. Background

FFC provides management services to the Affiliates, who own certain Carl's Jr. restaurant franchises, or "stores," in Los Angeles County. Global manufactures and repairs commercial signs. Beginning in April 2007, FFC employee Kimberly Avan and Global employee Mark Chavez engaged in discussions and exchanged emails about a potential business relationship between FFC and Global. These discussions covered possible work related to the replacement of "clearance" signs located above the drive-through lanes at some stores, signs for a possible new Carl's Jr. store in Azusa (which did not materialize), sign repair and maintenance work, and a franchisor-mandated project to remodel— or "reimage"—Carl's Jr. stores.

---

[3] Global's respondent's brief (in appeal No. B269427) fails to comply with rule 8.204(a)(1)(C) of the California Rules of Court, which requires that briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Compliance with this rule is particularly important when, as here, the record is large and complex. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287.) We are not required to scour the record in search of support for a party's factual statements and may disregard such unsupported statements. (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149.)

4

Global was primarily interested in acquiring FFC's reimaging work. In September 2007, Chavez asked to meet with FFC to discuss the "Carl's Jr.—Sign Service—Sign Program." (Capitalization omitted.) Avan informed Chavez that FFC was "still in the planning stages" and "not ready to move forward with any remodeling" at that time. Avan explained that her "first project" continued to be "finding a cheaper vendor for our sign repair which I recall you sending me your price list. I still need to review that and I will let you know what the outcome. At this time a meeting would be premature since we are not ready to move forward and I don't know when that will be except that it will happen, eventually." When Chavez inquired further, Avan responded: "Rest assured that I will bid out all upcoming projects to you and am confident that you will get our business. There are so many plans in the works that it is hard for me to get a priority on any of them. . . . Please know that I want to work with you and look forward to the opportunity and I apologize that I cannot give you a definite answer."

Later that month, Avan asked Chavez about Global's hourly sign repair rates, and Chavez responded with a one-page "preliminary pricing sheet" of material prices and labor rates for the sign maintenance program. Avan informed Chavez that Global "would have to lower [its] labor rates" "to be competitive," and added that when she is "done with this project, [Global] will be potentially getting all the stores." Chavez sent Avan a revised pricing sheet for the sign maintenance program and informed Avan that Global would modify its prices to "meet [FFC's] budget needs."

Chavez also told Avan that Global planned to conduct site surveys of each FFC-managed Carl's Jr. At the arbitration hearing, Chavez explained that the surveys would allow Global to create an inventory of signs at each site that could be used in the event of a service call. The surveys, Chavez added, would also be beneficial to Global in preparing drawings for new signs.

On October 24, 2007, Avan made a presentation to Harshad Dharod, the Chief Executive Officer of FFC, and seven FFC district managers regarding sign maintenance vendors, among other matters. Avan presented a spreadsheet showing the hourly rates for three sign vendors and the savings that would result if FFC replaced its then-current vendor with Global. She did not discuss the reimaging program, and no decision was made at that time as to the reimaging project. Dharod "approved" Avan to "go forward" and choose a vendor. Avan ultimately selected Global to be FFC's "go to sign maintenance company," and informed Chavez of the decision.

On October 29, 2007, Chavez wrote to Avan in response to getting "the go-ahead" from Avan "to do the sign maintenance program," and to confirm that Global would begin conducting "sign and facility surveys as part of the Carl's Jr.—Sign and Facility Survey—Sign Inventory Program." Chavez told Avan that Global would perform the surveys "at no cost to [FFC]." As Global's counsel later explained, the site surveys and Global's initial sign drawings were done "as a means of winning [FFC's] business."

Over the next 18 months, Global performed sign maintenance and repair work at FFC locations and billed FFC for its work. FFC paid Global approximately $160,000 over the course of their relationship. Meanwhile, Global continued to conduct site surveys, prepare sign plans for particular stores, and obtain sign permits for numerous FFC stores in anticipation of their remodeling.

At some point, Avan met with her superior, Dharod (FFC's principal) and "pitched" the reimaging project, and Dharod "approved" it. Avan testified that she could not recall when this meeting occurred. According to Avan, Dharod agreed to "maybe try one store and see how it goes." Dharod testified that FFC sought and considered bids for remodeling *individual* stores, not bids for the *entire* reimaging project. Avan would receive bids from vendors and present them to Dharod for his approval. Avan did not have

the authority to award projects or enter into contracts on FFC's behalf.

In April 2008, Chavez informed Avan that Global had prepared site surveys and sign designs "for all Carl's Jr. sites," and would "commence with sign pricing for all locations." Chavez requested information as to FFC's "projected conversion/remodel timeline," and said Global "will target pricing in the order of [FFC's] proposed work." On April 29, 2008, Avan responded, and told Chavez that FFC "want[ed] to start the remodels this summer. We need to start late June or July and HAVE to do 22 each year for the next three years." Avan added that FFC "still ha[d] a few things" it needed "to work out," but that she would keep him informed "as things progress[ed]."

In June 2008, Chavez emailed Avan regarding the need to obtain sign permits before the stores were remodeled. "The average lead time" for obtaining permits, he stated, is two to four weeks. Avan responded, stating: "4 months!! Holy crap!!! Let's start applying right away."[4]

The first store to be reimaged was in Baldwin Park. Avan requested bids from numerous vendors for the Baldwin Park remodel and presented them to Dharod, who selected Global based on its price and Avan's recommendation. Global performed the sign work for the remodel of the Baldwin Park store in July 2008, and FFC paid Global for the work. FFC then placed the broader reimaging project "on hold." It did not resume the reimaging program until August 2009, after this litigation began.

In 2009, Global's owner, Michael Blakely, grew frustrated with the pace of FFC's payments on invoices for sign maintenance

---

[4] It is not clear from the record why Avan said "4 *months*" in response to Chavez's reference to "[t]wo (2) to [f]our (4) *weeks*." (Italics added.)

work and with FFC's attempts to reduce the amounts due. By June 2009, $24,188.72 remained unpaid on outstanding invoices.

On June 6, 2009, Global issued an invoice to FFC for $90,635, which covered Global's work conducting site surveys, preparing sign drawings, and obtaining permits. Six days later, Global filed a verified complaint in the superior court against FFC. Global alleged causes of action for breach of contract, open book account, common counts, and quantum meruit. Each cause of action was based on the allegation that FFC and Global "entered into various written invoice agreements" for work "invoiced from October 31, 2008 through June 6, 2009." FFC allegedly defaulted on these agreements by "failing to pay the outstanding invoices then due and or the invoices thereafter invoiced." "[T]he total principal sum of $114,823.72 remain[ed] due"—an amount equal to the $24,188.72 of old unpaid invoices and the $90,635 invoice sent in June 2009. The complaint sought that amount, plus interest, costs, attorney fees, and "such other relief as the court deems just and proper."

FFC filed a first amended cross-complaint alleging causes of action for breach of contract, abuse of process, slander of title, and defamation. The breach of contract cause of action was based upon alleged "various written invoice agreements" between FFC and Global. The other causes of action were based primarily on Global's filing of mechanics liens on several of FFC's properties.

During pretrial discovery, Global did not identify or produce any documents to support a claim for lost profits or damages in excess of the $114,823.72 claim asserted in its complaint.

## B.     The Arbitration

On June 2, 2010, after discovery had been completed, and 19 days before trial was scheduled to begin, FFC and Global entered into an arbitration agreement. The agreement identified Global's complaint and FFC's cross-complaint, and recited that "[t]he dispute involves the amount of money FFC owes to Global for services performed." The parties agreed to "submit all disputes

8

relating to this [a]greement to binding arbitration, in accordance with California Code of Civil Procedure [sections] 1280-1294.2." They further provided that "[t]he matter shall be arbitrated by and in accordance with the JAMS Arbitration Administrative Policies and the applicable JAMS Arbitration Rules and Procedures." The Affiliates were not parties to the agreement.

The arbitration agreement provided that the "[a]rbitrator shall apply California law as though he were obligated by applicable statutes and precedents and case law, including the admissibility of evidence and shall endeavor to decide the controversy as though he were a judge in a California court of law." It further provided: "The [a]rbitrator shall prepare a written decision that shall be supported by written findings of facts and conclusions which adequately set forth the basis of the decision and which cites the statutes and precedents applied and relied upon in reaching his decision. . . . Any party may object to the confirmation of the decision and award on the basis that the statement of facts and the conclusions of law do not support the decision and award, and/or that the law was incorrectly determined or applied. The arbitrator shall apply the substantive law of the State of California and the United States, if such law would apply if the matter were decided in court, in deciding the issues submitted to arbitration. The parties agree that the decision of the [a]rbitrator and the findings of fact and conclusions of law shall be reviewed on appeal to the trial court and thereafter to the appellate courts upon the same grounds and standards of review as if said decision and supporting findings of fact and conclusions of law were entered by a court with subject matter and present jurisdiction."

The agreement required that a pre-arbitration hearing be held within 20 business days after the selection of an arbitrator, and the arbitration must be completed and a decision rendered within 90 calendar days thereafter. The arbitrator was required to "establish any deadlines necessary to accomplish this goal."

9

The arbitration hearing, which Global's counsel originally estimated would take one day, took place over six days in May and June 2012. During the arbitration, Global took the position that it had a contract with FFC to perform reimaging work on all 66 of FFC's stores, that FFC wrongfully cancelled that contract, and that Global was entitled to the profits it would have received in the absence of the breach. According to Blakely (Global's owner), the parties entered into the reimaging contract in October 2007. Blakely believed the contract was "based on our conversations, based on accepted projects, [and] based on e-mail conversations to re-image 66 locations." In support of this theory, Blakely referred to the "grid pricing" that Global purportedly created and presented to FFC in 2007. The "grid pricing" document was marked as exhibit 86.

During the arbitration hearing, Global made an oral motion to have the Affiliates added as parties to the arbitration, and the arbitrator granted the motion. Shortly thereafter, the arbitrator set aside that ruling pursuant to a stipulation among counsel. According to the stipulation, Global preserved its "right to seek an order from a court . . . to add one or more of the Affiliates as [r]espondents in the arbitration and/or as defendants in the underlying lawsuit."

Approximately four months later, in October 2012, the arbitrator issued an interim award stating that FFC and Global had agreed to a binding sign maintenance program and, based in part on exhibit 86, a project to reimage FFC's 66 stores over a three-year period. The arbitrator found that FFC had breached the maintenance agreement by failing to pay Global $24,188.72 due on outstanding invoices, and breached the reimaging agreement "when it refused to call Global to perform reimaging work . . . and instead hired another sign company to perform this work." Global was therefore entitled to recover $1,130,675 in "los[t] profits" for the breach of the reimaging contract.

10

FFC objected to the interim award on the grounds, among others, that the arbitrator exceeded his authority under the arbitration agreement to consider and decide Global's claim that it had a contract to reimage all 66 of the FFC-managed stores. The arbitrator overruled the objections in December 2012.

In April 2013, the arbitrator granted FFC's motion for leave to conduct discovery with respect to exhibit 86. After discovery, FFC moved to strike exhibit 86 and vacate the interim award on the ground that Global had fraudulently represented the exhibit during the arbitration. The arbitrator granted the motion and found that "[e]xhibit 86 was falsely described and represented," granted FFC's motion to strike the exhibit and withdrew the interim award with respect to the lost profits claim. The arbitrator further ordered Global to file a brief identifying evidence it "offered during the arbitration [that] supports its demand for [its] lost profits claim for reimaging work, excluding any reference to [e]xhibit 86."

Global thereafter submitted the required brief and attached to it approximately 100 pages of emails and other documents that had not been previously introduced. (The documents were purportedly found on Chavez's wife's laptop computer.) The documents include a series of spreadsheets, each described as a "***PRELIMINARY COST SUMMARY***," for 13 of FFC's stores. (Capitalization, underlining and boldface in original.) Chavez purportedly emailed these documents to Avan on various dates in October 2007. Chavez asked Avan in the emails to "review the attached information and provide comments and questions as required," and notes that "added costs savings can/will be applied with quantity sign orders and/or location agreements." The belatedly-produced documents do not indicate that Avan responded to these cost summaries.

Global's new evidence did include one email exchange between Chavez and Avan, which took place on October 24, 2007, the date of Avan's presentation to FFC's management regarding the

sign maintenance program. That morning, Chavez sent an email to Avan attaching a revised, one-page "preliminary pricing sheet as it pertains to the Carl's Jr. Sign Maintenance Program." Avan responded in the afternoon stating: "The new prices look great! I am so excited about it!!" She then informed Chavez that a sign had "blow[n] off" at a store in Reseda and asked Chavez for an estimate to replace it. Avan also stated that Global's proposal for a fixed, per month price for sign maintenance, when compared with FFC's then-current expenses, did not "seem like a more cost effective solution." Avan did not mention the preliminary cost summaries or the reimaging program.

FFC moved to strike the new documents, and Global moved to have them admitted. The arbitrator ultimately allowed the documents into evidence and expressly relied on the preliminary cost summaries in finding that the parties had entered into a contract for reimaging the FFC-managed stores.

In October 2014, the arbitrator issued an amended interim award, again finding that FFC was liable to Global for $24,188.72 due on maintenance invoices and $1,130,675 in "lost profits" for the breach of the reimaging contract. The arbitrator did not award Global any amount with respect to the $90,635 invoice Global issued just prior to filing its complaint.

In January 2015, Global filed a motion with the arbitrator to reinstate the arbitrator's order adding the Affiliates as parties to the arbitration. FFC opposed the motion on the ground, among others, that the prior stipulation to set aside the arbitrator's ruling precluded the arbitrator from reinstating the order. For unexplained reasons, the arbitrator granted the motion and added the Affiliates as parties.

On May 13, 2015, nearly five years after the parties agreed to arbitrate,the arbitrator issued a final award in favor of Global, awarding Global $24,118.72 "for unpaid invoices on the maintenance program and $1,130,675.00 for lost profits on the

12

reimaging program," plus $702,093.86 in pre-award interest (which will continue to accrue at 10 percent). Global was also awarded $1,051,066.50 in attorney fees and $91,529.70 in costs. The total of damages, attorney fees, costs, and interest (as of the date of the award) was $2,985,628.28. The arbitrator also ruled that the Affiliates were joint and several obligors under the award. The arbitrator awarded FFC $149,360 in attorney fees in connection with FFC's motion to reopen the arbitration with respect to exhibit 86.

### C.     Post-Arbitration Proceedings and Appeals

On May 22, 2015, Global filed a petition in the superior court to confirm the award, and FFC and the Affiliates filed petitions to vacate the award.[5] The trial court confirmed the award as to FFC and vacated the award as to the Affiliates, and entered judgment accordingly. FFC and Global appealed. We assigned case No. B269427 to these appeals.

The trial court thereafter denied Global's and the Affiliates' motions for attorney fees, but ruled that the arbitrator has "discretion to award such fees in whatever proportion the arbitrator decides." FFC and the Affiliates appealed from these orders, which we assigned case numbers B275942 and B275947, respectively.

We have consolidated the three appeals (case Nos. B269427, B275942, and B275947) for purposes of oral argument and decision.

FFC contends that the parties' arbitration agreement provided for trial court review of the arbitration award for legal error, and that the trial court failed to review the award on that basis. FFC further contends that if the proper standard of review

---

[5] Global's petition commenced Los Angeles County Superior Court case No. BS155974; FFC's petition commenced Los Angeles County Superior Court case No. BS155973; and the Affiliates' petition commenced Los Angeles County Superior Court case No. BS155377.

13

is applied, the arbitration award cannot stand because: (1) the alleged "reimaging" agreement is barred by the statute of frauds; (2) the evidence is insufficient to support the arbitrator's award of lost profits damages; (3) the arbitrator erroneously admitted and relied on evidence of FFC's conduct in other litigation; and (4) Global's lost profits claim was outside the scope of the arbitration agreement.[6]

Global disputes FFC's contentions and, in Global's cross-appeal, argues that the trial court erred in denying its petition to confirm the arbitrator's award as to the Affiliates and granting the Affiliates' petition to vacate the award. The Affiliates, as cross-respondents, contend that the trial court properly vacated the award as to them.

FFC and the Affiliates further contend that the trial court erred in ruling on the motions for post-arbitration attorney fees by stating that the arbitrator had discretion to award attorney fees related to the petitions to confirm and vacate the arbitration award.

---

[6] FFC further contends that even if a more deferential standard of review is applied, the award must be vacated because (1) the arbitrator committed prejudicial misconduct, (2) the award was procured through corruption, fraud, or undue means, and (3) the arbitrator erred in failing to permit FFC to rebut Global's evidence of FFC's litigation practices. Lastly, FFC contends that the award should be vacated because the arbitrator failed to comply with certain contractual procedures and deadlines. Because we reverse the judgment on other grounds, we need not and do not address these arguments.

## DISCUSSION

### I. The Arbitration Agreement Provided for Review of Legal Error

The arbitrator determined that courts could not review his decision "for errors of fact or law," and the trial court agreed. FFC contends that these conclusions are wrong, and that the trial court should have reviewed the arbitrator's decision under the standards for appellate review of a court's judgment. We agree with FFC.

Generally, an arbitrator's determination of the merits of a controversy is subject to very narrow judicial review, and the arbitrator's decision cannot be reviewed for errors of fact or law. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 (*Moncharsh*).) This rule "is consistent with the usual expectations of parties to arbitration agreements, who accept the risk of legal error in exchange for the benefits of a quick, inexpensive, and conclusive resolution." (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1360 (*Cable Connection*).) This general rule, however, does not apply when the parties have agreed to "limit the arbitrators' authority by providing for review of the merits in the arbitration agreement." (*Id.* at p. 1364.)

In *Cable Connection*, the parties agreed to the following arbitration clause in a sales agency agreement: " 'The arbitrators shall apply California substantive law to the proceeding, except to the extent [f]ederal substantive law would apply to any claim. . . . The arbitrators shall prepare in writing and provide to the parties an award including factual findings and the reasons on which their decision is based. The arbitrators shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.' " (*Cable Connection, supra*, 44 Cal.4th at pp. 1341-1342, fn. 3.) A dispute among the parties arose and was submitted to arbitration. A majority of a panel of arbitrators found in favor of one party and against the other. The trial court vacated

15

the award on the ground, among others, that the arbitrators' award "reflected errors of law that the arbitration clause placed beyond their powers and made subject to judicial review." (*Id.* at p. 1342.) The Court of Appeal, however, held that the trial court erred by reviewing the merits of the arbitrators' decision. (*Id.* at p. 1343.) The Supreme Court disagreed, and reversed. (*Id.* at p. 1364.)

The Supreme Court explained that the general rule of limited judicial review is based "not on statutory restriction of the parties' contractual options, but on the parties' intent and the powers of the arbitrators as defined in the agreement. These factors support the enforcement of agreements for an expanded scope of review. If the parties constrain the arbitrators' authority by requiring a dispute to be decided according to the rule of law, *and* make plain their intention that the award is reviewable for legal error, the general rule of limited review has been displaced by the parties' agreement. Their expectation is not that the result of the arbitration will be final and conclusive, but rather that it will be reviewed on the merits at the request of either party." (*Cable Connection*, *supra*, 44 Cal.4th at p. 1355.) Acting in accordance with the "rule of law," as the *Cable Connection* Court used that phrase, means acting " 'in conformity with rules of law.' " (*Id.* at pp. 1359-1360.)

Here, the parties agreed that the "[a]rbitrator shall apply California law as though he were obligated by applicable statutes and precedents and case law" and "apply the substantive law of the State of California and the United States, if such law would apply if the matter were decided in court, in deciding the issues submitted to arbitration." This language unambiguously requires the arbitrator to act in conformity with rules of law—specifically, in accordance with applicable California and federal substantive law.

The parties also plainly expressed "their intention that the award [be] reviewable for legal error." (See *Cable Connection*, *supra*, 44 Cal.4th at p. 1355.) The arbitration agreement obligated the arbitrator to "prepare a written decision that shall be supported

16

by written findings of facts and conclusions which adequately set forth the basis of the decision and which cites the statutes and precedents applied and relied upon in reaching his decision." Most significantly, the arbitrator's findings of fact and conclusions of law, as well as "the decision of the [a]rbitrator . . . shall be reviewed on appeal to the trial court and thereafter to the appellate courts upon the same grounds and standards of review as if said decision and supporting findings of fact and conclusions of law were entered by a court with subject matter and present jurisdiction." The standards of review of a court's factual findings and legal conclusions are well-settled: We review factual findings for substantial evidence and legal conclusions de novo. (See, e.g., *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) By providing for such review, the parties plainly expressed their intention that the merits of the award be subject to review under these standards.

The trial court rejected FFC's argument by stating: "The [c]ourt finds that in contrast to *Cable Connection*, the [a]rbitration [a]greement in this case does not explicitly and unambiguously provide for expanded judicial review beyond that provided by statute. In other words, the [c]ourt is not reviewing the [a]rbitration or the [a]ward for errors of law." We disagree with the trial court's interpretation. Although the language in the instant agreement is not identical to the language in the agreement examined in *Cable Connection*, the Supreme Court did not require the use of any particular words to provide for expanded judicial review; what matters is that the parties "make plain their intention that the award is reviewable for legal error." (See *Cable Connection*, *supra*, 44 Cal.4th at p. 1355; see also *Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 987-988 [provision that a court's "standard of review" in an action to set aside arbitration award " 'will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury' " was "similar" to the

17

provision in *Cable Connection*].) As we explained above, the parties have done so here. The trial court erred in concluding otherwise.

The trial court's failure to apply the agreed-upon standards of review does not require reversal unless it is reasonably probable that a result more favorable to FFC would have been reached if the court had applied the correct standards of review. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853.) One pertinent standard is our standard for reviewing factual findings to determine whether they are supported by substantial evidence.

" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) This requires that we review the entire record, not merely the " 'isolated bits of evidence selected by the respondent' " (*People v. Johnson* (1980) 26 Cal.3d 557, 577), and that we focus "on the quality, rather than the quantity, of the evidence" (*Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651). "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Id.* at p. 652.) FFC argues that the arbitrator's finding that the parties had entered into the reimaging contract that satisfies the statute of frauds does not meet this test. We agree.

An essential element of any contract is the mutual consent of the parties. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) " 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.] Outward manifestations thus govern the finding of mutual consent required . . . for contract formation. [Citation.] The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' [Citation.] If there is no evidence establishing a

18

manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation. [Citations.]" (*Ibid.*)

The arbitrator found that the alleged reimaging contract was to be performed over three years.[7]  Under California's statute of frauds, when, as here, a contract is not to be performed within one year it "or some note or memorandum thereof, [must be] in writing and subscribed by the party to be charged or by the party's agent." (Civ. Code, § 1624, subd. (a).)  The writing need not contain all of the contract's terms; it is sufficient "if it identifies the subject of the parties' agreement, shows that they made a contract, and states the essential contract terms with reasonable certainty." (*Sterling v. Taylor* (2007) 40 Cal.4th 757, 766.)  The purpose of this requirement is " 'to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made.' " (*Ibid.*, quoting Rest.2d Contracts, § 131, com. c., p. 335.)

Viewing the record most favorably to Global, as we must, there is no substantial evidence in the record that FFC ever agreed to have Global perform the reimaging work for any store other than the Baldwin Park store.  Nor is there any evidence of any writings that satisfy the statute of frauds.

To support its contention that a 66-store reimaging contract existed, Global points to Avan's testimony that she met with

---

[7] The finding that the contract was to take place over three years appears to be based on Avan's April 23, 2008 email to Chavez stating that FFC would start the remodels in June or July 2008 and "do 22 each year for the next three years."  Blakely, however, testified that he believed the contract was to be performed over the course of 18 months.  Because the statute of frauds applies to contracts not to be performed within one year, the discrepancy is immaterial.

19

Dharod and "pitched the reimaging project, and he approved it."[8] Global infers from this statement that Avan pitched *Global's bid to reimage 66 stores* and that Dharod approved that bid. The inference is not reasonable in light of Avan's further testimony and the whole record. After testifying that Dharod approved of Avan's "pitch," Global's counsel and Avan engaged in the following colloquy.

"[Global's counsel:] When you were pitching the re[]imaging project, what is it you were pitching?

"[Avan:] I don't recall specifically, but generally it was the idea of doing it ourselves, how can we do this in the most cost effective way and still get it done and get approved, but finish it in a timely manner and basically the least expensive way . . . possible.

"[Global's counsel:] And when he approved it, then you went ahead and implemented it?

"[Avan:] No, approved it meaning, okay, you know, let me think about it, let's maybe—let's maybe try one store and see how it goes. [Dharod] basically said, okay I think you are doing the right thing, I think we are down the same path, approve it meaning let's—let's maybe try it. He still had to mul[l] it over and talk to other people . . . , but we were on the path of going somewhere, which was a big step.

"[Global's counsel:] Do you recall that first store that he mentioned?

"[Avan:] Yes.

"[Global's counsel:] Which one was that?

_____

[8] Global's noncompliance with California Rules of Court, rule 8.204(a)(1)(C), mandating citations to the record (see fn. 3, *ante*), is compounded by the fact that its citations to Avan's testimony are not to the transcripts of her testimony, but to the pages in Global's trial court brief. The citations, in turn, refer to transcript pages that do not correspond to the pages in the record on appeal.

"[¶] . . . [¶]

"[Avan:]  In Baldwin Park.  That was our test store."

When viewed in its context, Avan's testimony indicates that her "pitch" was concerned with the project of reimaging stores in general; she was not pitching any particular bid to reimage 66 stores, or even one store.  Indeed, there is nothing in the cited testimony to indicate that either Avan or Dharod had mentioned Global or any other potential vendor during Avan's "pitch."  The testimony does not support the existence of a three-year reimaging contract with Global.

Moreover, there is no evidence of a bid or offer from Global to reimage all 66 stores.  In order for FFC's acceptance to form a contract, the bid it accepts " 'must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.' [Citation.] . . . The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." ' [Citation.]" (*Weddington Productions, Inc. v. Flick*, *supra*, 60 Cal.App.4th at p. 811.)  Here, the arbitrator relied on the preliminary cost summaries regarding 13 stores to support the requisite definiteness.  These "preliminary" documents, however, were insufficient to support a contract for the 13 stores they referred to, let alone all 66 stores.[9]  The 13 preliminary cost summaries were accompanied by emails indicating that the prices

---

[9] As noted above, the preliminary cost summaries were not admitted or even produced prior to or during the evidentiary presentation of the arbitration hearing.  They were presented to the arbitrator in response to the arbitrator's order that Global *identify* evidence introduced during the evidentiary hearing that supported the formation of the reimaging contract.  Although the submission violated the arbitrator's order, the arbitrator admitted the materials over FFC's objection, and expressly relied on them in making his decision.

remained subject to negotiation and that Global contemplated a formal written agreement. Moreover, there is no substantial evidence that FFC ever treated such summaries as offers or, if it had, that it accepted them. Furthermore, even if Avan's testimony regarding her pitch of the reimaging project could be viewed as Dharod's approval of Global as a vendor for any store other than the Baldwin Park store, there is no evidence that anyone communicated such approval to Global in any writing or otherwise.

Global also refers to Avan's testimony regarding her October 2007 presentation to Dharod and district managers concerning Avan's proposals for saving costs by switching to Global as FFC's sign maintenance vendor. In the passage quoted by Global, Avan described her presentation and how, "at the end they all just [clapped] and said okay, do it." When this testimony is viewed in its context, however, it unmistakably relates to Avan's presentation regarding *sign maintenance*, not the reimaging program. Omitted from the passage that Global quotes in its brief are the prefatory questions: "[S]o eventually then did [Global] become your go to *sign maintenance company*?"; and "[i]n terms of approving [Global] as your vendor, who else was involved in that?" (Italics added.) The testimony does not support the existence of a contract to reimage 66 stores.

Global next refers to Avan's testimony regarding the bidding process for the reimaging of stores generally and of the one store for which Global was selected to provide the signage. The testimony, particularly when viewed in its context, does not suggest that FFC invited or considered bids for a contract that would cover 66 stores. Although the particular testimony does not specifically refer to the Baldwin Park store, Avan had previously testified that the first store to be reimaged was the Baldwin Park store and subsequently clarified that the only "final price quote" she had ever received from Global for any store was the bid she had received for the Baldwin Park store. Indeed, our record discloses only one price quote labeled

22

as "final":  the quote for the Baldwin Park remodel.  Moreover, Avan further testified that FFC approved of Global's bid only for the Baldwin Park store because Global was not a franchisor-approved vendor and had never reimaged a Carl's Jr. store; selecting Global was therefore "a big risk."  As she put it:  "I mean we were one store in, what if they sucked later, then we would change them."  In light of the entire record, the cited testimony does not reasonably support the existence of a reimaging contract beyond the Baldwin Park store.

Even if the evidence of Avan's meetings and conversations with Dharod and other FFC managers indicated that Avan had made a pitch or presentation to have Global perform the reimaging of all FFC-managed stores—and Dharod had accepted Avan's proposal—no contract with Global could be formed unless FFC communicated its acceptance of Global's offer to Global.  (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 187, p. 221.)  Global, however, points to no evidence that Avan or any other representative of FFC ever informed Global that FFC had agreed to give Global the right to reimage any store other than the Baldwin Park store.  Although the parties had an agreement as to the Baldwin Park store and Avan informed Chavez that Global would be its "go to" vendor for repairing and maintaining signs, there is nothing in the record to indicate that she ever promised Global anything more.

Global also points to numerous emails between Avan and Chavez concerning the clearance sign project, the sign maintenance work, and the reimaging program, which, when viewed individually or collectively, do not reasonably express "a manifestation of assent" to have Global perform the reimaging work on 66 stores. (*Weddington Productions, Inc. v. Flick*, *supra*, 60 Cal.App.4th at p. 811.)

The arbitrator expressly relied on Chavez's October 29, 2007 letter to Avan as confirmation that Avan had informed Chavez

23

that Global had been awarded the maintenance and reimaging contracts, and that "Global accepted the contract and would commence work on both programs." The October 29 letter, however, makes no mention of the reimaging or remodeling program, and states that Global will commence conducting sign and facility surveys, "at no cost to" FFC. It does not reasonably suggest or imply an agreement to reimage any store. Moreover, even if the letter could be viewed as implying an agreement, it would not satisfy the statute of frauds because it was signed only by Chavez.

Global also points to evidence that it had undertaken actions in furtherance of getting, or "winning," FFC's reimaging business. In addition to preparing the preliminary cost summaries for 13 stores, Global conducted site surveys of each store (for which Chavez stated FFC would not be charged), created sign drawings based on a Carl's Jr. design manual, and obtained sign permits for numerous stores for which it claimed $90,635 for reimbursement in both its complaint and before the arbitrator. But Global's demand to be reimbursed for those costs is contrary to their own commitment to do the work for free, and belies its claim that the parties had entered into a contract to reimage 66 stores.

Lastly, FFC cross-examined Chavez at some length as to whether Chavez believed that FFC was obligated to use Global for reimaging all 66 stores. He initially stated that the two businesses "had developed a relationship, and we were given direction[s] to follow, and we did that"; we were "producing what the client asked us to do" and Global "expect[ed] to have something given back." When informed that he had not answered the question, Chavez added: "All I can say is we followed in a path that was consistent with what [FFC] had asked us to do." When pressed further, however, he eventually conceded that FFC's use of Global to reimage its stores was "at [FFC's] discretion."

24

Even if we assume there was some evidence from which we could infer an oral agreement for reimaging work beyond the Baldwin Park store, Global has referred us to no evidence of a writing subscribed by anyone at FFC that would satisfy the statute of frauds. Indeed, Chavez testified that, with the exception of the Baldwin Park reimaging, "FFC wouldn't sign anything." Further, even if we also assume that Avan's emails could otherwise satisfy the statute of frauds, there are no emails or writings from Avan that identify with reasonable certainty the essential terms of a contract to reimage 66 stores. (See *Sterling v. Taylor*, *supra*, 40 Cal.4th at p. 766.)

In the absence of any substantial evidence to support the arbitrator's findings that the parties had entered into a reimaging contract or that the proffered writings satisfy the statute of frauds, the award must be vacated.[10]

## II. The Arbitrator Erred In Considering Global's Belated Reimaging Contract Claim

FCC further contends that the arbitration award must be vacated because the arbitrator did not have the power to determine the reimaging contract claim for lost profits. We agree.

FFC argued in the arbitration and before the trial court that Global's lost profits claim was not within the scope of the parties' arbitration agreement and the arbitrator exceeded his authority by determining that claim. The arbitrator rejected the argument, finding that the lost profits claim "is not a new 'claim' and that lost profits constitute a standard remedy for damages caused by a

---

[10] Because the evidence is insufficient to support the arbitrator's award, the challenged claims may not be retried or reheard. (See *People v. Scott* (2000) 85 Cal.App.4th 905, 925 ["when a *civil* case is reversed on the ground of insufficiency of the evidence, the case is properly terminated; it is not remanded for a new trial"].)

breach of contract, nor is it a different remedy. Global's Demand for Arbitration always alleged a cause of action for breach of contract and for damages. The cause of action related to 65 stores and damages for the reimaging program amounted to over $1,100,000.00 in the opinion of Global."[11]

The trial court also rejected FFC's argument, stating that the "award of lost profits is not a new claim but a remedy that arises from the breach of contract between Global and FFC." Although "the complaint in the underlying lawsuit sought more limited damages," the trial court explained that the complaint "is not controlling. The [a]rbitration [a]greement describes the dispute as about the amount of money owed by FFC to Global for services performed. This is not a specific statement, and if the contract was intended to concern only limited damages, it would have included specific numbers." We review de novo a ruling that an arbitrator has acted within the authority granted to him under the arbitration agreement. (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 945.) We agree with FFC.

The scope of arbitration is a matter of agreement between the parties, and the arbitrator's powers "derive from, and are limited by, the agreement to arbitrate." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 375; see also *Moncharsh, supra*, 3 Cal.4th at p. 8; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323.) "[A]s such, a party cannot be required to arbitrate an issue or grievance it has not agreed would be subject to arbitration." (*Pacific Crown*

---

[11] Although the arbitrator referred to a "Demand for Arbitration," our record does not include a document with that title. It appears from our record that the arbitration proceedings were initiated when Global's counsel submitted Global's superior court complaint, a copy of the arbitration agreement, and a letter describing the dispute to JAMS. We discuss counsel's letter below.

*Distributors v. Brotherhood of Teamsters* (1986) 183 Cal.App.3d 1138, 1143.) An arbitrator that resolves issues the parties did not agree to arbitrate or awards a remedy the parties did not authorize exceeds the scope of his or her powers. (*Service Employees Internat. Union, Local 1021 v. County of San Joaquin* (2011) 202 Cal.App.4th 449, 462.)

Ordinarily, the question whether a particular claim or issue is subject to arbitration is a matter to be determined by the trial court, not the arbitrator. (*Litton Financial Printing Div. v. NLRB* (1991) 501 U.S. 190, 208.) When, however, "the parties clearly and unmistakably provide otherwise," the arbitrator may determine the scope of the arbitration. (*AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 649; accord, *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 552.)

Here, Global contends that the parties, by providing that the matter will be arbitrated in accordance with the JAMS arbitration rules, "conferred upon the [a]rbitrator the authority to determine the scope of the arbitration and to interpret the [a]rbitration [a]greement." Global points to rule 11 of the applicable JAMS rules, which provides: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which [a]rbitration is sought . . . shall be submitted to and ruled on by the [a]rbitrator. The [a]rbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

We need not decide whether the parties' agreement to arbitrate in accordance with the JAMS rules constitutes a clear and unmistakable agreement to have the arbitrator decide the scope of the arbitration. As explained above, the parties agreed that the arbitrator's decision is reviewable under the standards applicable to a court's determination. Thus, even if the parties clearly and unmistakably agreed that the arbitrator had, under JAMS rule 11, "the authority to determine jurisdiction and arbitrability issues

27

as a preliminary matter," the parties also agreed that the arbitrator's determination of arbitrability was subject to review under applicable standards of appellate review. Where, as here, the language of the arbitration agreement is not in dispute and the arbitrability determination was not based on the credibility of extrinsic evidence, the applicable standard is de novo. (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 771.) Therefore, regardless of whether the arbitrator or the trial court was the appropriate person or court to determine the scope of arbitration in the first instance, the respective decisions are subject to our de novo review, and we are not bound by either previous determination. (*Ibid.*)

Turning to the language of the arbitration agreement, the parties identified at the outset Global's complaint and FFC's cross-complaint, and stated that "[t]he dispute involves the amount of money FFC owes to Global for services *performed*. Global asserts one amount and FFC disputes such amount. Additionally, FFC seeks affirmative relief in its cross-complaint for the matter alleged in the cross-complaint." (Italics added.) The arbitration agreement also provides that the parties agreed to "submit all disputes relating to this [a]greement to binding arbitration."

Global's complaint cannot reasonably be viewed as encompassing the reimaging contract and lost profits claim developed during the arbitration. In its complaint, Global alleged, in essence, that FFC "entered into various written invoice agreements with [Global]" for labor and materials "invoiced from October 31, 2008 through June 6, 2009," and that FFC "defaulted on said agreements, failing to pay the outstanding invoices then due and or the invoices thereafter invoiced, and the total principal sum of $114,823.72 remains due and owing." There is nothing in the pleading to suggest that FFC and Global had a reimaging contract or that Global was seeking anything other than the amount allegedly due and owing on invoices it had issued to FFC.

28

Indeed, Blakely admitted at the arbitration hearing that at the time Global filed its complaint, he did not believe that Global had a contract for reimaging, and believed that Global's damages were limited to what Global had previously billed. Nor does FFC's cross-complaint imply the existence of any dispute related to an alleged reimaging contract.

Tellingly, the parties defined the "dispute" in the arbitration agreement as involving the amount of money FFC owes to Global "for services *performed*." (Italics added.) The use of the past tense is consistent with the nature of the claims asserted in Global's complaint, which sought payment on invoices for services that Global allegedly *previously* performed. The alleged lost profits Global suffered as a result of the breach of an alleged reimaging agreement, by contrast, was not for any services that Global previously performed; instead, the lost profits were the money Global would have received for work it *would have performed* in the future.

The limited nature of the claims asserted in the pleadings is further confirmed by Global's responses to pretrial discovery. FFC propounded interrogatories and document requests pertaining to the allegations of the complaint. FFC requested, for example, all documents that supported each of Global's causes of action and all contracts between Global and FFC. Global produced invoices and documents pertaining to its claim for $114,823.72, but none that supported a claim for the alleged imaging contract or lost profits related to that work.

A limited, pleadings-based definition of the dispute is supported by a letter Global's counsel wrote to initiate the arbitration proceeding with JAMS. In that letter, Global's counsel described the matter as follows: "Global performed certain services for FFC in connection with various Carl's Jr. fast food franchise outlets. When FFC failed to pay the invoices submitted by Global, Global filed a lawsuit in the spring of 2009 against FFC seeking

29

to recover approximately $120,000. . . . [¶] The primary issue appears to be whether FFC had authorized a large portion of the work for which Global submitted an invoice to FFC. . . . We expect that the matter will be a straightforward examination of the facts to determine whether FFC authorized the work performed by Global and whether or not other bases exist for Global to recover compensation from FFC for the work performed. [¶] We expect that the arbitration would not take more than one day."

This view is further supported by a letter Global's counsel provided to FFC's counsel the following month in which he detailed the basis for Global's $90,635 invoice. Counsel explained that the industry's and Global's practices were "to bill for all services and materials upon the completion of a job. However, if a job is abandoned by the client, [Global] and others in the industry then bill for all professional services rendered. This is what happened between FFC and [Global]. [Global] performed the professional services but waited to invoice the services in the belief that the stores would be re-imaged and the invoices would be sent when the re-imaging for each store was complete. When it became clear in 2009 that FFC was not moving forward with the re-imaging of the stores, then [Global] prepared and sent an invoice to FFC for all professional services rendered at FFC's request." The invoice, he concluded, "simply captured [the] professional services that had not been previously billed." There is nothing in the letter to indicate that the then-pending arbitration encompassed a claim for lost profits under an alleged reimaging agreement.

It does not appear from our record that Global informed either the arbitrator or FFC that it would attempt to expand the scope of the arbitration until after the hearing began in May 2012. Although the applicable JAMS rules provide that a party may make "a new or different claim" in a writing served on the other party, who may file a response, Global did not do so.

Global also relies on the contractual requirement that the arbitrator apply California law and section 469 of the Code of Civil Procedure, which permits a trial court to amend a party's pleading to conform to proof.[12] (See generally 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, §§ 1209-1212, pp. 641-646.) Global contends that any variance between its complaint and the facts presented during the arbitration hearing was immaterial because FFC was not misled. We disagree. Our review of the record, including the transcript of the arbitration hearing, supports FFC's characterization of the reimaging contract/lost profits claim as "a claim by ambush." It was not until the last day of the six-day arbitration hearing, during FFC's cross-examination of Blakely, that Global produced the "grid pricing" that became exhibit 86, the document that purportedly supplied the schedule of prices for the reimaging contract. Until then, it appears that FFC reasonably believed that it was defending against the limited claims alleged in Global's complaint. Even if the arbitrator had the power to amend the complaint to conform to proof, the arbitrator erred by failing to provide FFC with the opportunity to respond to the new claim. (See 5 Witkin, *supra*, Pleading, § 1212 at pp. 645-646.)

Lastly, the language in the arbitration agreement by which the parties agreed to "submit all disputes relating to this [a]greement to binding arbitration" does not help Global. The arbitration agreement relates to the dispute as defined by reference to the claims asserted in the parties' court pleadings. Because Global's reimaging contract/lost profits claim is not encompassed

---

[12] Code of Civil Procedure section 469 provides: "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that a party has been so misled, the Court may order the pleading to be amended, upon such terms as may be just."

31

within those pleadings, it does not relate to the arbitration agreement.

In short, the record establishes that the parties agreed to submit to arbitration the disputes alleged in Global's complaint and FFC's cross-complaint. Because FFC did not agree to submit to arbitration any claim for lost profits based on an alleged reimaging contract, the arbitrator did not have the power to determine or award damages on that claim. Because the arbitrator's awards of attorney fees and costs in Global's favor are inextricably related to the award on the reimaging contract claim, that award must also be reversed.[13]

### III.	The Trial Court Properly Vacated the Award As to the Affiliates

During the arbitration hearing, Global moved to add the Affiliates as parties to the arbitration, and the arbitrator granted the motion. Thereafter, the parties entered into a stipulation, signed by the arbitrator, that included the following: "The arbitrator's order adding . . . the Affiliates as defendants/respondents in the arbitration shall be set aside. [Global] reserves the right to seek an order from a court of competent jurisdiction to add one or more of the Affiliates as [r]espondents in the arbitration and/or as defendants in the underlying lawsuit." As part of the stipulation, FFC agreed that if

---

[13]  Although the arbitrator's final award reflects an award of $149,360 to FFC for its attorney fees incurred in connection with its efforts to reopen the arbitration with respect to exhibit 86, FFC's petition to vacate the award sought only "to vacate and set aside the [f]inal [a]ward." It did not seek to preserve its award of attorney fees. Nor does FFC contend on appeal that we should provide any relief to it with respect to that part of the award. Accordingly, we do not address any issue concerning the award of attorney fees to FFC.

32

judgment is entered against it, it would not challenge the judgment on the ground that FFC did not own the Carl's Jr. restaurants for which Global provided services.

In January 2015, Global filed a motion with the arbitrator to reinstate the arbitrator's order adding the Affiliates as parties to the arbitration. In the arbitrator's final award, the arbitrator granted the motion, stating that the Affiliates were named in the underlying lawsuit as Doe defendants, and that FFC acted as their agent in entering into the arbitration agreement. The arbitrator further found that "adding the Affiliates as respondents is necessary and appropriate to protect the efficacy of the [f]inal [a]ward and to conserve the resources of the parties and of the courts by avoiding future litigation between Global and the Affiliates."

The trial court granted the Affiliates' petition to vacate the award, stating that the arbitrator "clearly exceeded his powers by adding the Affiliates." The stipulation, the court explained, "remove[d] the [a]rbitrator's authority to add the Affiliates to the [a]rbitration." (Underlining in original.) According to the stipulation, the question "whether the Affiliates would be joined was to be decided by a [c]ourt."[14] The trial court further explained that the arbitrator's decision "effectively denied the Affiliates a hearing on the merits" because they were added in the final award and never given an opportunity to present a defense.

The court's order is correct. The provision in the stipulation to set aside the arbitrator's ruling adding the Affiliates as parties

_____

[14] In January 2016, Global filed a motion to amend the judgment to add the Affiliates and Dharod as judgment debtors. The trial court denied this motion, stating that "it would not be proper to add the Affiliates and Dharod to the [j]udgment at this time." Global filed a notice of appeal from that order, but later expressly abandoned that appeal.

33

to the arbitration, followed by Global's reservation of the "right to seek an order from a court" to add the Affiliates reasonably implies that any subsequent motion by Global to add the Affiliates to the arbitration, the lawsuit, or the judgment would be made to "a court," not the arbitrator. Indeed, Global's interpretation—that the arbitrator could still add the Affiliates as parties—would have permitted Global to make a new motion to the arbitrator to add the Affiliates as parties immediately upon entering into the stipulation. The act of setting aside the arbitrator's order would be rendered effectively meaningless, depriving FFC of the benefit of the bargain it made in entering into the stipulation.

Reasonably construed, therefore, the stipulation required that any motion to add the Affiliates as parties to the arbitration be made to a court, not the arbitrator. The stipulation thus had the effect of withdrawing from the arbitrator's authority the power to determine whether the Affiliates could be added to the arbitrator's award. The trial court, therefore, did not err in denying Global's petition to confirm the award as to the Affiliates and in granting the Affiliates' petition to vacate the award as to them.

## IV.    The Orders Denying Attorney Fees

After the trial court confirmed the arbitrator's award as to FFC and vacated the award as to the Affiliates, Global filed a motion for an award of attorney fees incurred to confirm the arbitration award as to FFC. The motion was based on paragraph 11 of the arbitration agreement, which provides that "the arbitrator may award the prevailing party its expenses and fees of arbitration, including reasonable attorney fees and witness fees, in whatever proportion the arbitrator decides." FFC opposed the motion on the ground that this provision only permits the recovery of attorney fees "borne during arbitration," not fees incurred in the trial court proceedings to confirm the arbitration award.

34

After Global filed its motion, the Affiliates filed a motion to recover an award of attorney fees incurred to vacate the arbitrator's award against them.[15]  The Affiliates took the position that neither they nor Global were entitled to recover post-arbitration attorney fees "because no statutory or contractual vehicle exists" for such an award.  Both motions, they asserted, should therefore be denied.  Nevertheless, the Affiliates argued that, "if the [c]ourt disagrees . . . and determines that a valid attorneys' fees provision indeed exists, then *both parties*, the Affiliates and Global, would be eligible for attorneys' fee awards."

The trial court denied the motions in separate orders, stating in each:  "The agreement to arbitrate was negotiated by the parties and the attorney fees clause ([paragraph] 11) is specific that only the arbitrator may award attorneys fees and further gives him discretion to award such fees in whatever proportion the arbitrator decides.  This [c]ourt finds that the petitions to confirm or vacate the arbitrator's award is part of the arbitration pursuant to the agreement to arbitrate."[16]

FFC appealed from the order denying Global's motion and the Affiliates appealed from the order denying their motion.  Global did not appeal from either order.  On appeal, FFC and the Affiliates contend that the arbitration agreement "does not provide for anyone to recover fees incurred post-arbitration, regardless of the final merits outcome," and they request that our decision "reduce satellite litigation on remand, by making clear that . . . regardless of the outcome of the [appeal on the merits], post-arbitration fees are not recoverable."

---

[15]  The Affiliates requested $210,595.50 in attorney fees. Global sought $1,525,200.00 in fees.

[16]  Judge Josh M. Fredericks heard and denied the motions for attorney fees.

Global contends that the appeals from the orders denying attorney fees are premature and should be dismissed. The contention has merit. Although an order denying a post-judgment motion to recover attorney fees is ordinarily appealable (see, e.g., *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 654-655), the orders in this case contemplate that the parties would return to the arbitrator for a determination of the amount of attorney fees to be awarded. That award would presumably then lead to competing petitions to confirm and vacate the arbitrator's award and, eventually, an appealable order. The trial court's orders were thus "preliminary to future proceedings" and, therefore, not appealable. (*Id.* at p. 654.)

In extraordinary circumstances, however, we may deem a purported appeal from an unappealable order as a petition for writ of mandate. (See *Olson v. Cory* (1983) 35 Cal.3d 390, 401.) Such circumstances are present here. Although Global devoted the initial portion of its brief to its argument that the appeal should be dismissed, it thereafter fully briefed the issues raised in the opening briefs. By addressing the issues now, we can protect the parties and the courts from venturing further down an " ' "unnecessarily dilatory and circuitous" ' " path that has already extended much longer and cost far more than the parties could have possibly envisioned when Global filed its complaint eight years ago. (See *ibid*.) Therefore, in the interest of justice and judicial economy, we will deem the appeals from the orders denying the motions for attorney fees as petitions for writ of mandate.

In light of the positions FFC and the Affiliates take on appeal and our conclusions concerning the merits of the arbitration award, we can quickly dispose of the attorney fees issues. Because we reverse the trial court's order granting Global's petition to confirm the arbitration award against FFC and we affirm the trial court's order granting the Affiliates' petition to vacate the arbitration award as to them, Global is not a prevailing party as to the

post-arbitration proceedings and, therefore, not entitled to recover its fees from either the trial court or the arbitrator under any interpretation of the attorney fees provision.  Because FFC and the Affiliates assert that no one is entitled to post-arbitration attorney fees regardless of the outcome of the appeal on the merits, there is no question presented as to whether FFC and the Affiliates might be entitled to recover their attorney fees for post-arbitration proceedings.  Accordingly, we do not reach such questions.[17]

---

[17] As noted above, the merits of Global's claims may not be retried or reheard by an arbitrator.  (See Discussion *ante*, at p. 25, fn. 10.)  If, after remand, further proceedings before an arbitrator are held to determine whether a party is entitled to recover costs and attorney fees related to the arbitration proceeding and, if so, the amount of such costs and fees, the rehearing shall not be held before the original arbitrator unless the parties consent. (Code Civ. Proc., § 1287.)

## DISPOSITION

The judgment in superior court case No. BS155974 in favor of Global and against FFC is reversed. The court is directed to vacate its orders granting Global's motion to confirm the arbitrator's award as to FFC and denying FFC's motion to vacate the award, and to issue a new order denying Global's motion to confirm the award and granting FFC's motion to vacate the award.

The order granting the Affiliates' motion to vacate the arbitrator's award is affirmed.

We hereby deem the appeals from the orders dated June 9, 2016, in superior court case Nos. BS155974 and BS155377 concerning Global's and the Affiliates' motions for attorney fees to be petitions for writ of mandate. Good cause appearing therefor, let a peremptory writ of mandate issue, directing the trial court to vacate such orders and to make different orders denying the motions.

FFC and Affiliates are awarded their costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>.**


                                        ROTHSCHILD, P. J.

We concur:



CHANEY, J.



LUI, J.


38